## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CICELY TAYLOR, o/b/o          )
L.B., as next friend,         )
                              )
    **Plaintiff,**        )
                              )
    vs.                 )   **Case number 4:09cv1453 TCM**
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                              )
    **Defendant.**       )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security (the Commissioner), denying the application

for supplemental security income benefits (SSI) under Title XVI of the Social Security Act,

42 U.S.C. § 1381-1383b, filed on behalf of L.B. (Plaintiff) by his mother, Cicely Taylor,[1]

is before the undersigned for a final disposition pursuant to 28 U.S.C. § 636(c). Plaintiff has

filed a brief in support of his complaint; the Commissioner has filed a brief in support of his

answer.

## Procedural History

---

[1]Plaintiff's mother is referred to in the administrative record as Cicely Bishop. The Court will refer
to by the name she used when filing this action.

Ms. Taylor applied for SSI on Plaintiff's behalf in September 2005, alleging he was disabled as of May 26, 2005, due to a learning disorder and speech disorder. (R.[2] at 69-71.) This application was denied initially and following an administrative hearing in January 2007 before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at 13-22, 62-66, 267-77.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 8-10.)

## Testimony Before the ALJ

Ms. Taylor and Plaintiff, represented by counsel, testified at the nine-minute administrative hearing.

Ms. Taylor testified that Plaintiff is no longer a student in the Parkway School District. (Id. at 270.) They had moved after their house burned down in 2005 and for him to be accepted as a transfer student he had to be in good standing. (Id.) He was not because of suspensions and his behavior. (Id.) The last report card she had from that district was for the seventh grade. (Id. at 270-71.) The card indicated that he had been absent 54 days. (Id. at 271.) Other than the suspensions, which did not add up to 54 days, she did not know why he was absent. (Id.) After Parkway, Plaintiff attended Northwest Middle School. (Id.) He got into trouble at that school also and had been suspended for shoving a teacher the previous month. (Id.) Following this incident, Plaintiff was transferred to an alternative school. (Id. at 272.) One teacher at the school had called her to report that he was skipping a class. (Id.)

---

[2]References to "R." are to the administrative record electronically filed by the Commissioner with his answer.

At home, Plaintiff is agitated and bossy.  (Id. at 272-73.)  He does what he wants to do.  (Id. at 273.)  He does not do any homework because the school does not give any.  (Id.)  He has problems focusing and takes Concerta.  (Id.)  He goes to Grace Hill Neighborhood Health Center (Grace Hill) every three months.  (Id. at 274.)  All his medical treatment for the past two years has been at Grace Hill.  (Id. at 275.)

If Plaintiff likes someone, he will respect them.  (Id. at 274.)  If he does not know someone, he will not.  (Id.)

When asked what was going on at school that he had been in fights, Plaintiff replied, "Nothing."  (Id. at 276.)  Asked what he wants to be when he gets out of school, he answered that he wants to be a real estate agent.  (Id.)  He understands that he will have to graduate from high school to be one and plans on doing so.  (Id. at 276-77.)

## Medical, School, and Other Records Before the ALJ

The records before the ALJ included reports Ms. Taylor completed as part of the application process, school records, and medical records.

When applying for SSI for her son, Ms. Taylor completed a Disability Report.  (Id. at 118-24.)  She listed his height as 5 feet 4 inches and his weight as 126 pounds.  (Id. at 118.)  He became disabled on May 26, 2005, by a learning disability.  (Id. at 119.)  He was in the seventh grade, was in special education, and received speech therapy.  (Id. at 122, 123.)  He saw doctors at Grace Hill Family Center, who had diagnosed him with Attention Deficit Hyperactivity Disorder (ADHD).  (Id. at 120.)  He did not take any medication.  (Id. at 121.)

On a Function Report form for children ages twelve to eighteen – Plaintiff was born in 1992 – Ms. Taylor reported that Plaintiff did not have any problems seeing hearing. (Id. at 180-81.) He had problems talking clearly, but could be understood by people most of the time, regardless of whether those people knew him well. (Id. at 182.) His daily activities, his ability to communicate, and his physical abilities were not limited. (Id. at 183, 184.) His ability to progress in learning was limited in that he could not understand, carry out, and remember simple instructions. (Id. at 184.) He could, however, do such things as read and understand stories in books, magazines, or newspapers and make correct change. (Id.) His impairments affected his social activities and behavior with other people in that he did not generally get along with his siblings and school teachers and he would leave the classroom and take things from other students. (Id. at 185.) His ability to take care of his personal needs and safety was not limited. (Id. at 186.) His ability to pay attention and stick with a task was limited in that he did not do any of the six listed activities, including, inter alia, finishing things he started or completing chores. (Id. at 187.) He needed to be reminded to do something. (Id.)

In a Daily Activities Report, Ms. Taylor stated that Plaintiff stayed up late. (Id. at 189.) He had two siblings. (Id.) One, who was seven years old, he got along with; the other, who was eleven, he did not. (Id.) He did not read at his grade level. (Id. at 190.) He was too active and played too much. (Id.) His attendance was okay when he was not on suspension. (Id.) He played football. (Id. at 191.) He did not do his chores, which included taking out the trash, cleaning his bedroom, and occasionally cleaning the bathroom. (Id.)

He had problems following instructions.  (Id.)  He talked back to her and argued with and hit his sister.  (Id. at 191.)  She has had numerous complaints from his teachers.  (Id.)  He got along okay with his friends as long as things go his way; otherwise, he "gets an attitude or fight[s]."  (Id. at 192.)  He talked too fast and did not make sense.  (Id.)  No medications were listed.  (Id. at 190.)

In another questionnaire, Ms. Taylor reported that Plaintiff was in a special education program and received special therapy.  (Id. at 173, 175.)  He takes Concerta for attention deficit hyperactivity disorder (ADHD); it makes him sleepy.  (Id. at 177.)  On a separate, undated form, Ms. Taylor listed Concerta, 27 milligram dosages, as Plaintiff's only medication.  (Id. at 117.)  It was prescribed by Dr. Edmonds.  (Id.)

Plaintiff's medical records are from the Grace Hill Neighborhood Health Center (Grace Hill) and are of three visits.

In December 2005, Plaintiff went to Grace Hill with complaints of a rash on his neck, back, and chest for two to three weeks and pain and swelling in his left knee for two months.  (Id. at 257-58.)  The rash was unaccompanied by itching or fever.  (Id. at 257.)  He was given a medicated shampoo and prescription for the rash and was to have his knee x-rayed.  (Id. at 258.)

Plaintiff saw Tom Vogel, Psy.D., at Grace Hill Child Development Center (CDC) in January 2006.  (Id. at 264.)  It was reported that he had a history of an ADHD diagnosis treated with Ritalin.  (Id.)  He also had a diagnosis of learning disabled.  (Id.)  Plaintiff denied any problems, but agreed to participate in sessions and try medication until he was

able to get at least Cs in his classes. (Id.) Dr. Vogel noted that Plaintiff was to be evaluated for his medication needs that day by Dr. Edmonds. (Id.)

In August 2006, Plaintiff was seen again at Grace Hill. (Id. at 260-63.) His grandmother reported that the Concerta was not helping and he had been suspended four times from school. (Id. at 260.) After noting that Plaintiff had been seen at the CDC but once, Dr. Vogel remarked that Plaintiff's mother would be contacted about "further involvement with CDC." (Id. at 263.)

Plaintiff's school records before the ALJ begin in 2000.

In March 2000, Plaintiff was given the Wechsler Intelligence Scale for Children, Third Edition (WISC-III). (Id. at 169.) He had a verbal intelligence quotient (IQ) of 90, a performance IQ of 75, and a full scale IQ of 81. (Id.)

Following a conference in October 2003 in which a school psychologist, education examiner, speech and language pathologist, and two teachers participated, Plaintiff was diagnosed as learning disabled in the areas of basic reading skills, reading comprehension, and written expression. (Id. at 169-70.) He was to have additional testing in the areas of speech and language "to address programming needs and possible modification of diagnosis." (Id. at 170.) This testing was due to a concern with his "articulation skills and weak critical thinking, word relationships, subject verb agreement and auditory processing skills." (Id.) Plaintiff was to receive language therapy. (Id.)

Teachers and administrators with the Special School District of St. Louis County (SSD) met in September 2004 to develop an individualized education program (IEP) for

Plaintiff when he was in the sixth grade at Parkway South Middle School.[3] (Id. at 150-66.)
His learning disorder was found to affect his abilities to recognize words, read, and
understand vocabulary at his grade level; formulate complete sentences; use writing
conventions; express ideas clearly and sequentially; use synonyms and antonyms; use word
relationships; compare and contrast information; paraphrase passages; and speak intelligibly.
(Id. at 151.) His strengths included wanting to do well, responding well to positive feedback,
being helpful to others; requesting clarification; and, when in a small group setting, asking
for help when needed and participating in classroom discussions. (Id.) Plaintiff was reading
at a first to second grade level and needed extensive adaptation to complete his classroom
and homework assignments. (Id.) His goals included reading a passage at his instructional
level and stating the main idea, details, characters, and sequence of events with 80%
accuracy; writing five to seven related sentences on the same topic with correct punctuation,
capitalization, grammar and spelling with 70% accuracy; improving his semantic and
syntactic language skills with 80% accuracy; and using strategies for improving speech
intelligibility 80% of the time. (Id. at 154-56.) To help him accomplish these goals, Plaintiff
would receive 240 minutes weekly instruction in each of three subjects – reading, writing,
and math – and 290 minutes weekly in speech and language therapy. (Id. at 157.) He would
spend 45% of his time in the general education setting. (Id. at 158.)

In May 2005, five teachers and a counselor with the SSD met to discuss a IEP for
Plaintiff. (Id. at 125-46, 193-213.) Plaintiff was then at Parkway West Middle School. (Id.

---

[3]Ms. Taylor was unable to attend the meeting. (Id. at 165, 166.)

at 196.)  Ms. Taylor was notified of the meeting but did not wish to attend.  (<u>Id.</u> at 126, 193.)

Plaintiff's behavior problems to be addressed included talking out loud during class when the

teacher or other students were talking or working or "shut[ting] down and sleep[ing]."  (<u>Id.</u>

at 127, 194.)  This behavior was attributed to him becoming frustrated and wanting to avoid

work.  (<u>Id.</u>)  He was to be given two warnings to stop talking and begin assignments.  (<u>Id.</u>)

It was noted that he might need to hear the directions again at this time.  (<u>Id.</u>)  It was also

noted that Plaintiff responded well to positive interactions.  (<u>Id.</u>)  Strategies to be employed

included seating him away from the biggest distractions, anticipating when he would talk

inappropriately and give him a task to do, and using "light hearted cues to keep [him] calm

and on task."  (<u>Id.</u>)  He was to be taught social skills.  (<u>Id.</u>)  He was to be called on in class

and, when he had a good day, was to be given "down time" at the end of the day.  (<u>Id.</u> at 128,

195.)  He would also be allowed to call home and report that he had had a good day.  (<u>Id.</u>)

It was further noted that Plaintiff's learning disability affected his abilities to recognize

words, understand vocabulary, and read at his grade level; to paraphrase a passage and

provide details; to express ideas in a paragraph form; and to use word relationships.  (<u>Id.</u> at

130, 197.)  He responded well to positive attention, understood language more than he let

on, could speak clearly and articulately when he chose to, did well in math when on task,

could write clear sentences and a five-sentence paragraph, participated in small group

discussions, and had a good sense of humor.  (<u>Id.</u>)  Since his last IEP, he attempted to decode

and read aloud in class, shared his weekend activities with the class when it was his turn, had

made progress in math, was proud when he did good work, and spoke very clearly when he concentrated and tried.  (Id. at 131, 198.)

The IEP goals developed for Plaintiff included reading a passage at his instructional level and stating the main idea, details, characters, and sequence of events at 80% accuracy; writing five to seven related sentences on the same topic with correct punctuation, capitalization, grammar, and spelling with 70% accuracy; speaking intelligibly 80% of the time; writing a paragraph on a particular subject with 70% accuracy; reading to decode and comprehend short stories and reading passages with 70% accuracy; and demonstrating grade-level math skills with 60% accuracy.  (Id. at 133-36, 200-03.)  To help him attain these goals, each week Plaintiff would receive 240 minutes of special education services in reading, 480 minutes in reading and written expression, 200 minutes in language therapy, and 40 minutes in speech therapy.  (Id. at 139, 206.)

In March 2006, the principal of Parkway West Middle School, the district representative, four teachers, a special school district representative, a component district representative, and Plaintiff met to discuss his IEP.  (Id. at 100-17.)  Ms. Taylor participated by telephone.  (Id. at 100.)  Plaintiff was described as having a learning disability, specifically, a basic reading disability, speech impairment, sound system disability, reading comprehension disability, and written expression disability.  (Id. at 101.)  He learned best through drill and repetition, structure and routine, and models and concrete examples.  (Id.)  His strengths were in athletics and social skills.  (Id.)  It was noted that there had been few academic changes due to his inconsistent attendance and "poor choices." (Id.)  He had tested

in the low average range. (Id.) Six academic goals were developed for Plaintiff as part of his IEP. One was to increase his decoding of unfamiliar words with 70% accuracy when given material at his instructional level. (Id. at 103.) The second goal was for Plaintiff to increase his reading comprehension skills with 70% accuracy when given activities at his instructional level. (Id. at 104.) A third goal was for Plaintiff to write a paragraph with a topic sentence, supporting sentences, and a conclusion with 80% accuracy. (Id. at 105.) The next goal was for Plaintiff to maintain intelligible speech at 85% accuracy during a conversation and with no more than one cue. (Id. at 106.) His fifth goal was to identify context clues to determine meaning with 85% accuracy. (Id. at 107.) He was to use correct word order in a variety of sentences with 75% accuracy with two to three clues. (Id. at 108.) As of May, he was making sufficient progress in each of these goals, and it was expected that he would meet all. (Id. at 103-08.) To help Plaintiff attain his goals, from April 2006 to April 2007, he was to receive 240 minutes weekly of special instruction in reading, 240 minutes weekly of special instruction in written expression, and 30 minutes weekly in speech therapy. (Id. at 109.) He was also to receive 450 minutes weekly of "language services." (Id.) He would be outside the general class for 21 to 60% of the time. (Id. at 110.)

As part of the IEP, a behavior intervention plan was also developed to address the problem of Plaintiff talking during class when the teacher or other students were talking. (Id. at 114.) The plan included, inter alia, teaching Plaintiff to talk and behave appropriately, regularly reminding him of class expectations, giving him a task when he started to talk loudly, and praising him when he appropriately raised his hand. (Id.) To accomplish these

goals, strategies to be employed included giving Plaintiff a "behavior sheet" with a "yes" marked for each hour his behavior was appropriate and allowing him privileges when he had good days.  (Id.)

During the next school year, in November 2006, a Student Discipline History for Plaintiff from the Parkway School District listed seven suspensions when he was in the fourth, fifth, and seventh grades.  (Id. at 98.)  He had one three-day suspension in the four grade for assaulting a student; one two-day suspension in fifth grade for disruptive behavior and another, three-day suspension for assault of a student and bullying; and four suspensions in the seventh grade, two for fighting and two for disruptive or insubordinate behavior.  (Id.) When in the seventh grade, his last at Parkway, he was absent for 54 days.  (Id. at 99.)

An attendance record from Northwest Middle School for the 2006/2007 school year – Plaintiff was then in the eighth grade – lists 98 school days during the covered period.  (Id. at 77.)  Plaintiff was present for 79, or 76.58% of the time.  (Id.)  He was absent for ten days due to out-of-school suspensions, the second of which was for seven days.  (Id.)  His report card for the fall semester of that year, lists Ds and Fs.  (Id. at 78, 82.)  It was noted that his attendance was poor and his behavior was "totally unacceptable," "rebellious," and "defiant." (Id.)  He did not complete assignments and talked instead of working.  (Id.)  On October 19, 2006, he was suspended for three days for fighting in the auditorium.  (Id. at 81, 83.)  In December, he was suspended for shoving a teacher, Patrick Shaw, into a door jamb and swinging at him after the teacher told him he was going to write him a referral for throwing pencils around the room.  (Id.)  At the end of the month, Ms. Taylor was informed that

Plaintiff had been reassigned to an alternative school and had been recommended for expulsion.  (Id. at 91-92.)

In addition to the foregoing school records, the ALJ had before him several reports or assessments completed pursuant to Plaintiff's SSI application.

In October 2005, when Plaintiff was in the seventh grade, four teachers completed a Teacher Questionnaire, assessing Plaintiff's ability to function in six domains.  (Id. at 215-22.)  They saw Plaintiff one to two hours a day, and had done so for seven weeks.  (Id. at 215.)  They reported that, when in a general education class, Plaintiff had a very serious problem (a five on a five-point scale) in one of the ten activities listed for the domain of acquiring and using information.  (Id. at 216.)  This activity was following oral instructions. (Id.)  He had a serious problem (a four on that scale) in this activity when in special education classes and also had a serious problem in three of the other activities.  (Id.)  He had an obvious problem (a three on the five-point scale) in four of the remaining six activities and a slight problem (a two on the scale) in two activities.  (Id.)  It was noted that Plaintiff had to have "many things retaught in a small group setting."  (Id.)  The teachers assessed Plaintiff as having a daily, serious problem in six of the thirteen activities listed for the domain of attending and completing tasks.  (Id. at 217.)  These activities included working without distracting himself or others, completing work accurately without careless mistakes, waiting to take turns, focusing long enough to finish assigned tasks or assignments, changing from one activity to another without being disruptive, and working at a reasonable pace and finishing on time.  (Id.)  He also had an obvious problem in three of the activities, a slight

- 12 -

problem in one, and no problem in three.  (Id.)  Plaintiff had a very serious problem in one

of the thirteen activities listed for the domain of interacting and relating with others, i.e.,

"respecting/obeying adults in authority."  (Id. at 218.)  He had a serious problem in five

activities, an obvious problem in one, a slight problem in two, and no problem in four.  (Id.)

Although the form provided for the frequency of the problem, e.g., daily, weekly, or hourly,

to be rated, the teachers did not do so.  (Id.)  They could understand "almost all" of Plaintiff's

speech, regardless whether the topic of conversation was known.  (Id. at 219.)  Plaintiff's

functioning in the domain of moving about and manipulating objects was age-appropriate.

(Id.)  Plaintiff had a daily, very serious problem in one activity and a daily, serious problems

in three activities in the domain of caring for himself.  (Id. at 220.)  Specifically, he had a

very serious problem in using appropriate coping skills to meet the daily demands of the

school environment and serious problems in handling frustration appropriately, being patient

when necessary, and using good judgment about personal safety and dangerous

circumstances.  (Id.)  He had an obvious problem in three of the remaining six activities and

no problem in the other three.  (Id.)  In the domain of physical well-being, it was noted that

Plaintiff took medication on a regular basis and that his functioning changed afterwards.  (Id.

at 221.)

      In February 2007, Patrick Shaw completed a Teacher Questionnaire, explaining that

he saw Plaintiff each school day for communication arts and had known him for six months.

(Id. at 84-91.)  He reported that Plaintiff had a serious or very serious problem[4] (a four or five on a five-point scale) in each of the six activities listed for the domain of acquiring and using information.  (Id. at 85.)  Plaintiff's communicative functioning was not age-appropriate; specifically, his topic of conversation could be understood by a familiar listener one-third to two-thirds of the time when  the topic was known and very little of the time when the topic was not known.  (Id.)  Plaintiff's speech would be understood almost all the time after repetition and/or rephrasing.  (Id. at 86.)  His oral language skills adversely affected his educational performance and his socialization with peers.  (Id.)  He had a very serious problem in having sufficient communication skills to express his basic wants and needs, to participate in and maintain a conversation, in relating experiences or retelling stories, and in understanding directions.  (Id.)  His functioning in the domains of moving about and manipulating objects, self-care, and physical health was age-appropriate.  (Id. at 87.)  In the domain of interacting and relating with others, Plaintiff had a daily, very serious problem in five of the seven relevant activities.  (Id. at 88.)  Mr. Shaw described Plaintiff as disruptive, easily frustrated, talking out of turn, having temper outbursts, and making inappropriate demands.  (Id.)  Plaintiff had daily problems in each of the nine activities listed for the domain of attending and completing tasks.  (Id. at 89.)  He had a very serious problem in five of the activities, including not finishing tasks on time, not maintaining pace, and being

_____

[4]The adjectives used in this questionnaire to describe the severity of the problem are different than in the one earlier completed by the four teachers.  As before, however, a five-point scale is used with the five being the most serious.  Therefore, for ease of reference, the Court will use the same adjectives as used in the first questionnaire, indicating the corresponding number on the five-point scale for purposes of comparison.

fidgety, overactive, and restless, an obvious problem in two, and a noticeable problem in three.  (Id.)

Also pursuant to his application, Plaintiff underwent a speech and language evaluation in December 2005 by Jennifer Henkhaus, M.A., CCC/SLP.[5]  (Id. at 240-53.)  Plaintiff was given the Clinical Evaluation of Language Fundamentals – Fourth Edition (CELF-4), and had scores consistent with a diagnosis of a mild receptive language impairment compared to his same-aged peers.  (Id. at 240, 243-53.)  His expressive language scores were within average limits compared to those peers.  (Id. at 240-41.)  Although formal language tests were not given, Plaintiff's interdental distortions of /s/ and /z/ adversely affected listener perception, but not speech intelligibility.  (Id. at 241.)  Thus, he was diagnosed also with a mild articulation disorder.  (Id.)  Ms. Henkhaus described Plaintiff as follows:

> [Plaintiff] was quiet, but pleasant and cooperative during testing.  He was difficult to engage in conversation, which was judged to be due to unfamiliarity with the examiner, since his sentence formulation skills on formal testing were appropriate.  He required additional prompting for elaboration, and provided only minimal additional information when requested.  His conversational responses were all appropriate and on topic. While his sentences were very brief and limited in terms of both semantic and syntactic complexity, they were generally grammatical at the conversational level.  His utterances contained dialectal variations at times, which are not considered to be errors.  [Plaintiff's] speech was fully intelligible in both known and unknown contexts despite minor interdental distortions of /s/ and /z/.  These distortions did not adversely affect his speech intelligibility but did adversely affect listener perception.  This is likely to be the case for untrained listeners as well. . . .

---

[5]CCC/SLP stands for Certificate of Clinical Competency/Speech-Language Pathology.  See C. Bowen, Frequently Asked Questions about Speech-Language Pathology, http://members.tripod.com/caroline_bowen/faqpart2.html (last visited Feb. 14, 2011).

(Id. at 241.)

A few weeks after this assessment, a Childhood Disability Evaluation Form was completed for Plaintiff by two non-examining consultants, R. R. Cottone, Ph.D., and Miriam Serfas, MHS, CCC/SLP. (Id. at 223-28.) Plaintiff's impairments were learning disability, mild receptive language disorder, and mild articulation disorder. (Id. at 223.) These impairments were serious but did not meet or equal an impairment of listing-level severity. (Id.) Specifically, they resulted in marked limitations in the domain of acquiring and using information, less than marked limitations in the domains of attending and completing tasks and interacting and relating with others, and no limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being. (Id. at 225-26.)

## The ALJ's Decision

After noting that Plaintiff was not engaged in substantial gainful activity, the ALJ concluded that he had severe impairments of a learning disability, a mild receptive language disorder, and a mild articulation disorder. (Id. at 17.) These impairments, singly or in combination, did not medically meet or equal an impairment of listing-level severity. (Id.) The question then was whether they functionally met or equaled such an impairment. (Id.) This would require that they resulted in an extreme limitation in one of the six domains of functioning or in marked limitations in two domains. (Id. at 18.)

The ALJ the summarized the evidence before him, including Ms. Henkhaus' findings, Dr. Vogel's notes, Mr. Shaw's answers on the Teacher Questionnaire, Plaintiff's March 2006

IEP findings, and the Childhood Disability Evaluation Form.  (Id. at 18-19.)  He then found that Plaintiff had marked limitations in the domain of acquiring and using information.  (Id. at 19.)  He next found that Plaintiff did not have marked limitations in the domain of attending and completing tasks, concluding that Plaintiff's failure to maintain attendance and complete tasks was primarily due to this behavior and not to his learning disability.  (Id. at 19-20.)  Nor did Plaintiff have marked limitations in the domain of interacting and relating with others.  (Id. at 20.)  Although Mr. Shaw expressed serious concerns about his functioning in this domain, Plaintiff's IEP indicated that he could speak clearly and articulate when he chose to.  (Id.)

The ALJ further found that there were no allegations of any limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well being.  (Id.)

Plaintiff was not, therefore, disabled within the meaning of the Act.

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence.  **Rucker v. Apfel**, 141 F.3d

1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995).   "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision.'"   **England v. Astrue**, 490 F.3d 1017, 1019 (8th Cir. 2007) (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision.  **Id.**; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th  Cir. 1998).  See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child is currently engaged in substantial gainful activity; (2) whether the child suffers severe impairments or a combination of severe impairments; and (3) whether the child's impairments meet or equal any listed impairments.  **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 647 (8th Cir. 2004); **Bryant v. Apfel**, 141 F.3d 1249, 1251 (8th Cir. 1998).  If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments (a) cause "marked" limitations in

two of six domains and or an "extreme" limitation in one and (b) meet the duration requirement of at least one year.  20 C.F.R. § 416.926a(d); accord **England**, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)).  "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings."  Id.  See also 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.  "An impairment is functionally equivalent to a listing when the impairment results in an 'extreme' limitation in one domain of functioning or a 'marked' limitation in two domains of functioning."  **England**, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)).  The six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

### Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he failed to properly consider (1) all the medically determinable impairments, (2) the medical opinion of record, (3) the third-party evidence, and (4) the relevant Social Security Rulings.  These arguments focus on the ALJ's findings that Plaintiff had less than marked limitations in the domains of attending and completing tasks and of interacting and relating with others.

The domain of attending and completing tasks requires a consideration of "how well [the child is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies]

through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). Attention "involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance." 20 C.F.R. § 416.926a(h)(1)(i). "As in any domain," when a child's limitation in this area is evaluated, the focus is on "how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." Title XVI: Determining Childhood Disability – The Functional Equivalence Domain of "Attending and Completing Tasks", Social Security Ruling 09-4p, 2009 WL 396033, *2 (S.S.A. Feb. 18, 2009). For example, a "need for frequent prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments." Id.

"Children with [ADHD] whose primary difficulty is inattention may be easily distracted or have difficulty focusing on what is important and staying on task." Id. at *3. "Children with [ADHD] whose primary difficulty is hyperactivity and impulsivity may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments." Id. "As with limitations in any domain," limitations in this domain are not considered unless they result from a medically determinable impairment. Id.

The most recent IEP before the ALJ included a behavior intervention plan to address the problem of Plaintiff talking when he should have been listening. That same school year,

teachers assessed Plaintiff as having problems in this domain that are consistent with an inability to stay focus and with being easily distracted. This assessment was given within two months after the beginning of the school year and followed a twenty-three month period when Plaintiff had had only one suspension. Beginning in February of the next semester, Plaintiff had one suspension per month for three months. The following school year, Mr. Shaw, the teacher Plaintiff had shoved against the door two months earlier, assessed Plaintiff as having a very serious problem, a five on a five-point scale, in the majority of activities listed for the domain of attending and completing tasks. These included being easily frustrated, defying authority and being disobedient, and not following class rules.

The ALJ attributed any problems Plaintiff might have in the domain of attending and completing tasks to his behavior and not to his medically determinable impairments of a learning disability, a mild receptive language disorder, and a mild articulation disorder. As noted, limitations must result from a medically determinable impairment. The question not addressed by the ALJ is whether Plaintiff's behavioral limitations result from a medically determinable impairment, specifically ADHD.

Dr. Vogel's notes refer to a diagnosis of ADHD, as do several forms completed by Ms. Taylor when filing for SSI for Plaintiff. Dr. Vogel also refers to an evaluation by Dr. Edmonds, who Ms. Taylor lists as the doctor who prescribes Concerta for Plaintiff. The four teachers noted that Plaintiff regularly took medication and that his functioning changed afterwards. The ALJ did not inquire during the brief hearing about whether Plaintiff had

been diagnosed with ADHD or why he was taking Concerta. No medical records from Dr. Edmonds were before the ALJ. Nor was there a consultative examination.

An ALJ has a duty to fairly and fully develop the record even where, as in the instant case, the claimant is represented by counsel. **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003); **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000). The record in the instant case included references to a diagnosis of, and treatment for, a medically determinable impairment which might be the cause of Plaintiff's behavior problems that result in limitations in the domain of attending and completing tasks. Because the ALJ did not fairly and fully develop the record on this issue, there is insufficient evidence from which to determine whether, if Plaintiff does have ADHD, it is controllable by medication. See **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007) (an impairment that is controllable by medication is not disabling). See also **Briggs v. Callahan**, 139 F.3d 606, 609 (8th Cir. 1998) (affirming ALJ's decision that child was not disabled when her hyperactivity was controlled by medication).

Also at issue is Plaintiff's functioning in the domain of interacting and relating with others. "To interact and relate effectively in any activity, a child must be able to recognize, understand, and respond appropriately to emotional and behavioral cues from other people. A child whose impairment(s) limits the ability to interact and relate with others may have various kinds of difficulties." Title XVI: Determining Childhood Disability – The Functional Equivalence Domain of "Interacting and Relating with Others", Social Security Ruling 09-5p, 2009 WL 396026, *2 (S.S.A. Feb. 17, 2009). A child of Plaintiff's age should

be able to "[r]elate[ ] appropriately to children of all ages and adults, both individually and in groups"; be "[i]ncreasingly able to resolve conflicts between self and . . . peers, and others outside of family"; and be able to "[r]ecognize that there are different social rules for dealing with other children than with adults (for example, behaving . . . more formally with people in authority)." Id. at *6.

At the time of the hearing, Plaintiff was in eighth grade. When in seventh grade, he had been suspended twice for fighting; the second time he had been suspended for five days. The month before the hearing, Plaintiff was given a ten-day suspension for assaulting a teacher and was facing expulsion. In addressing this domain, the ALJ discussed only the cause of any limitation in this domain that would be attributable to Plaintiff's speech disorders. As noted above, he did not address the issue of whether Plaintiff had ADHD and whether this impairment could be the cause of Plaintiff's clear difficulties in resolving conflicts and recognizing that there were rules for dealing with adults in authority, rules that did not include shoving a teacher against a door.[6] Nor did the ALJ inquire whether Plaintiff had indeed been expelled, an action that was being contemplated prior to the hearing.

**Conclusion**

---

[6]When discussing Plaintiff's limitations in this domain, the Commissioner correctly noted that he had had only nine disciplinary incidents from 2003 to 2006. This observation overlooks that the spacing and consequences of these incidents indicates that the behavior problems were escalating. For instance, in one calendar year, 2006, Plaintiff had been suspended for five days for fighting and ten days for assaulting a teacher.

Plaintiff might well not be disabled within the meaning of the Act. For the foregoing reasons, however, the ALJ's decision that Plaintiff is not supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is REVERSED and the case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of February, 2011.